1
2
3
4
5                          **UNITED STATES DISTRICT COURT**
6                               **DISTRICT OF NEVADA**
7
8   GARY A. FISK,                          )
                                           )
9                        Plaintiff,        )   Case No.: 2:16-cv-00291-JAD-GWF
                                           )
10  vs.                                    )   **FINDINGS AND**
                                           )   **RECOMMENDATION**
11  CAROYN W. COLVIN, Acting Commissioner, )
    Social Security Administration,        )
12                                         )
                         Defendant.        )
13  _____)

14          This matter is before the Court on Plaintiff Complaint to Set Aside the Final Order of the

15  Commissioner of Social Security (ECF No. 1), filed on February 12, 2016.  The Acting

16  Commissioner filed her Answer (ECF No. 7) on May 2, 2016.  Plaintiff filed his Motion for Remand

17  (ECF No. 17) on August 22, 2016.  The Acting Commissioner filed her Cross-Motion to Affirm

18  (ECF No. 18) on September 21, 2016.  Plaintiff did not file a reply brief.

19                            **I.  PROCEDURAL HISTORY**

20          Plaintiff filed an application for a period of disability, disability insurance benefits and

21  supplemental social security income on May 23, 2012, alleging that he became disabled beginning

22  January 1, 2011.  *See* Administrative Record ("AR") 132-138.   The Commissioner initially denied

23  Plaintiff's application on November 30, 2012, AR 75-78, and upon reconsideration on July 26, 2013.

24  AR 80-85.  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was

25  conducted on September 22, 2014.  AR 27-43.  The ALJ issued his decision on November 13, 2014

26  and concluded that Plaintiff was not disabled from January 1, 2011 through the date of his decision.

27  AR 10-20.  Plaintiff's request for review by the Appeals Council was denied on December 15, 2015.

28  AR 1-4.  Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).

This matter has been referred to the undersigned magistrate judge for a report of findings and recommendations pursuant to 28 U.S.C. §§ 636 (b)(1)(B) and (C).

## II.  FACTUAL BACKGROUND

### 1.  Work History Report, Disability Reports, and Pain Questionnaire Responses.

Plaintiff Gary A. Fisk was born in 1959.  According to medical records, Mr. Fisk's height was variously reported as 5'10", 5'11" and 6'0".  AR 278, 306, 331.  His weight varied between 240 lbs and 260 lbs.  AR 12, 257, 272, 278.  Plaintiff has a high school education.  He is married, but has no children.

Mr. Fisk was employed as an automobile mechanic from December 1994 to December 1999. He had a business doing home repair/home maintenance from December 1999 until he ceased working on January 1, 2011.  AR 178-181.  Plaintiff's jobs as an automobile mechanic and home repair/maintenance worker required him to use machines, tools and equipment; use technical knowledge and skills; and involved some writing.  AR 179, 180.  He estimated that during a regular workday as a home repair/maintenance worker, he walked 3 hours, climbed 1 hour, kneeled 1 hour, handled, grabbed or grasped big objects 1 hour, reached 1 hour, and wrote, typed or handled small objects 2 hours.  The heaviest weight he lifted was 50 pounds and he frequently lifted 10 pounds.  He also supervised two employees for two hours a day.  AR 179.  As a mechanic, he walked 2 hours, stood 2 hours, kneeled and crouched 1 hour, handled, grabbed or grasped big objects 1 hour, reached 1 hour, and wrote, typed or handled small objects 1 hours.  The heaviest weight he lifted was 50 pounds and he frequently lifted 25 pounds.  AR 180.

Mr. Fisk stated that he stopped working on January 1, 2011 due to chronic pain, left handed numbness, depression and anxiety.  AR 148.  He completed a function report on August 8, 2012 in which he stated that his ability to work was limited by right shoulder pain and lower back pain.  If he stood too long, his right thigh would go numb.  He was also dizzy on some days and could not be in direct sunlight because of medication he was taking.  He also had left hand numbness and anxiety. AR 170.  Prior to his illness, he was able to work all day in the sun, lift objects and perform any type of job duty.  As a result of his impairments, he now stayed at home and watched television.  On some days he would go out with his wife.  He had difficulty sleeping and was up all night.  He reported no

problems in performing personal care. AR 171. He did not require any special reminders to take care of personal needs or medicine. He sometimes prepared frozen dinners or sandwiches. Plaintiff did not do any house or yard work. AR 172. He drove an automobile and could go out alone. He was able to shop once a week for one hour for "small things," but could not be on his feet too long. He was able to pay bills, count change, handle a savings account and use checks or money orders. AR 173. Plaintiff listed fishing as a hobby, but stated that he could not go fishing often because he could not stand or be out in the sun very long. He did not engage in social activities or go out much. AR 174-175.

Mr. Fisk stated that his impairments affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, use his hands and get along with others. He could lift 10 lbs, but tried not to lift at all because it hurt his back. He could not do any overhead work because of shoulder pain. He could not stand or walk very long or far. He estimated that he could walk one block and would then have to rest for 10 minutes before resuming. His ability to pay attention and follow written and spoken instructions was normal. He was able to finish what he started. AR 175.

Mr. Fisk completed a pain questionnaire on June 1, 2013. AR 197-199. He stated that his pain began six years previously. He had lower back pain and right shoulder pain. His back pain also spread to his right thigh. He experienced pain on a daily basis and it was brought on by "moving." He took pain medication every four hours, and had been doing so for five years. The medication did not completely relieve his pain, but did "take[] the edge off." AR 197. He believed the medication caused constipation and dizziness. He attempted to relieve his pain by not moving around much and avoiding heavy lifting. Prior to his illness he was able to work seven days a week, twelve hours a day. He also fished and went camping. His impairments began to affect his activities "about three years ago." He no longer engaged in daily activities, except to drive with his wife. AR 198. He was able to do errands such as going to the Post Office or grocery store without assistance. He could walk one block, stand for 30 minutes, and sit for 30 minutes. He was still able to drive a car, but his wife performed all of the housekeeping chores. AR 199.

In a function reported dated May 29, 2013, Mr. Fisk stated that he could not bend over to put

on his socks and shoes, and that it was hard to put his arms above his head for long.  AR 201.  He no longer prepared meals.  AR 202.  He had not been fishing in one year.  AR 204.  He could walk for 30 minutes, but then needed to rest for one hour.  AR 205.  In an August 20, 2013 disability report, Plaintiff stated that he now had more back pain.  The pain used to be in his right hip, but it now went across his lower back.  The doctor had increased his pain medication.  AR 217.

### 2. Plaintiff's Hearing Testimony.

During the September 22, 2014 hearing, the ALJ asked Mr. Fisk what prevents him from working.  He stated that he has severe back pain.  He also noted that he previously had shoulder surgery and that if he did any work above his head, his shoulder "gets stuck."  His left hand was numb all the time.  He had arthritis in the right hip and his leg gave out on him.  "I could be walking and all of a sudden I almost fall on my face because my leg don't want to move where it's supposed to."  His medications made him dizzy.  His wife stayed with him 99 percent of the time because there were some days that he was too dizzy to drive.  AR 36.  Plaintiff tried not to lift anything.  He could only walk 100 yards before having to stop because his hip would start hurting and feel like it was going to give out.  He would need to rest a few minutes before moving on.  AR 38.

Plaintiff testified that he had recently received physical therapy, and could not walk for three days after the session.  *Id.*  He could sit for approximately one hour at a time.  His most comfortable position was lying on the sofa which he did for at least six hour a day.  On a good day, he could go grocery shopping with his wife and walk around for an hour.  He tried to go fishing on an out of town trip, but was unable to do so.  He was unable to drive home because of pain in his back and hip.  His dizziness varied between being present every day, or only once a week.  AR 39.  He slept two or three hours a night.  He also complained of problems with his focus or concentration because of the medication he was taking.  In addition to dizziness, his medications caused him to be tired.  AR 40.  Plaintiff testified that he had health insurance as of January, 2014.  He had previously been uninsurable because of diabetes.  AR 41.

Mr. Fisk testified that he had tried to perform some work after January 2011.  However, he was unable to do something as simple as changing a faucet while laying on his back under a sink.  AR 36.  His wife had tried to manage the home repair/maintenance business, but all of the income

went to subcontractors.  He tried to assist her by answering questions.  AR 37.

### 3. Vocation Expert's Testimony.

Vocational expert Shirley Ripp testified that Plaintiff's past work as a "handyman" and automobile mechanic was medium work with an SVP of seven.  The ALJ asked Ms. Ripp to consider a hypothetical person, of the same age, education and work experience as Plaintiff.  He asked whether there were any jobs at the medium level that are simple, repetitive and routine that the person would be able to perform.  Ms. Ripp responded that there was the job of kitchen helper.  Her testimony as to the number of such jobs available in the national economy was inaudible.  AR 34.  She also testified that there was the job of sandwich maker for which 50,015 jobs were available in the national economy.  AR 35.  Plaintiff's attorney asked Ms. Ripp whether Plaintiff would be able to perform his past relevant work if he had the physical and mental limitations that he testified about during the hearing.  She answered no.  Counsel also asked whether there were any other jobs Plaintiff could do given his age, educational level and transferrable skills.  Ms. Ripp stated: "No, not based on his testimony that he basically lays on the couch for six hours a day."  AR 42.

### 4. Dr. Tarrand's Hearing Testimony.

Dr. Nancy Tarrand, a psychiatrist, testified that with respect to the "B criteria," Plaintiff's restriction of daily living was mild from a psychiatric standpoint.  His difficulty with social functioning was moderate, and he had moderate limitation in concentration, persistence and pace.  Dr. Tarrand found no discrete episodes of deterioration or decompensation of a psychiatric nature.  AR 29-30.

### 5.    Medical Records.

**(a)  Dr.  Antonio Serru Paez.**  Mr. Fisk was seen by Dr. Antonio Serru Paez on ten occasions from March 12, 2010 through May 21, 2012.  AR 246-279.  On March 12, 2010, Plaintiff was seen for hypertension and diabetes.  Dr. Paez stated that he had mild hypertension and was tolerating medication well without side effects.  Plaintiff had type 2, noninsuln requiring diabetes.  His compliance with diabetes medication was noted as good.  Dr. Paez noted that Plaintiff had a past history for hyperlipidemia, hypertension, Type 2 diabetes, hypertensive heart disease, anxiety, joint pain ankle and foot, and upper back pain.  AR 277.   With respect to current problems, Dr. Paez

5

1   listed the same conditions plus unspecified myalgias, and shoulder pain. There was no indication,

2   however, that Plaintiff was experiencing significant pain. He weighed 263 lbs. AR 278. Mr. Fisk's

3   prescriptions were refilled and he was scheduled for a follow-up visit in 3 months. AR 279. Mr.

4   Fisk was seen again on June 2, 2010. There was no mention of shoulder or back pain, or pain in

5   other body parts. AR 274-276. He was seen again on September 7, 2010 at which time his condition

6   appeared to be unchanged. AR 271-273. He weighed 250 lbs. AR 272.

7       Dr. Paez next saw Plaintiff on December 9, 2010. AR 267-270. He noted that Plaintiff's

8   compliance with treatment for his diabetes was poor because he skipped some medication doses and

9   did not follow a diet and exercise program. AR 267. Dr. Paez further stated:

10              Additionally, he presents with history of shoulder pain. the patient
                notes localized joint pain. This has been a problem for the past several
11              years. He describes the discomfort as moderate in severity. Symptoms
                have been progressive and worsening. Primary joints affected include
12              right shoulder. Muscle groups affected include the deltoids.
                Aggravating factors include overwork and over exercise. No
13              associated symptoms are reported. Pertinent medical history is
                remarkable for **surgery**. AR 267.

14

15      Under "ROS," Dr. Paez noted that Plaintiff's musculoskeletal system was negative for

16  arthralgias, back pain and myalgias. *Id.* He weighed 258 lbs. Examination findings indicated that

17  he was in no acute distress. AR 268. In addition to refilling hypertension and diabetes medications,

18  Dr. Paez prescribed Lortab and Clonazepam. He recommended that Plaintiff reduce his salt intake,

19  take medication as prescribed, and lose weight. Plaintiff was advised to follow-up in three months.

20  AR 269-270. Dr. Paez next saw Plaintiff on March 22, 2011 at which time he discussed Plaintiff's

21  hypertension and diabetes. There was no mention of current shoulder pain or pain in other body

22  parts. AR 2 264-266. Plaintiff weighed 255 lbs. AR 265.

23      On June 23, 2011, Dr. Paez again discussed Plaintiff's hypertension and diabetes. AR 260.

24  He also repeated the statements he had made on December 9, 2010 regarding Plaintiff's right

25  shoulder pain. *Id.* Plaintiff weighed 247 lbs. Under general examination findings, he noted that

26  Plaintiff was well developed, well groomed and in no apparent distress. Under musculoskeletal

27  findings, he stated: "range of motion; **pain with right shoulder** abduction; internal rotation and

28  external rotation; no laxity or subluxation of any joint; Crepitus, Tenderness, Effusion: **tenderness**

6

1  **noted in the Right shoulder to pressure**.” AR 261.  Dr. Paez assessed chronic shoulder pain.  AR

2  262.  He refilled Plaintiff's prescriptions and scheduled him for follow-up in three months.  *Id.*

3      On September 27, 2011, Dr. Paez discussed Plaintiff's hypertension and diabetes and noted

4  that he had chronic right shoulder pain that had been present for several years and was moderate in

5  severity.  AR 256.  Plaintiff weighed 241 lbs.  AR 257.  Dr. Paez examined both of Plaintiff's feet as

6  part of his assessment of his diabetes.  The findings were normal.  *Id.*  He scheduled Plaintiff for

7  follow-up in three months.  AR 258.  On December 8, 2011, Dr. Paez stated that the medical

8  problems to be addressed included mixed hyperlipidemia and anxiety.  AR 253.  Dr. Paez noted that

9  “he presents with a history of anxiety, generalized.  his system complex includes apprehension.  True

10  panic attacks apparently do not occur.  The frequency symptoms is nearly every day.  Current

11  treatment includes a benzodiazepine.  He denies pertinent past medical history.  Family history is

12  negative for psychiatric disorders.”  AR 253.  The assessment of Plaintiff's right should pain was the

13  same as on prior visits.  AR 253.  Plaintiff weighed 239 lbs.  AR 254.  Plaintiff was scheduled for

14  follow-up in three months.  AR 255.  On March 16, 2012, Dr. Paez saw Plaintiff for his

15  hypertension and diabetes.  The same finding was stated regarding Plaintiff's chronic right shoulder

16  pain.  AR 249.  Plaintiff weighed 243 lbs.  Plaintiff was scheduled for follow-up in 3 months

17  regarding his diabetes.  Dr. Paez stated that Plaintiff should see him on a “p.r.n. basis” for his

18  chronic right shoulder pain.  AR 252.

19      Plaintiff's last visit with Dr. Paez was on May 21, 2012.  AR 246-248.  Plaintiff complained

20  of low back pain and left hand tingling.  The pain was primarily in the mid and lower lumbar spine

21  and radiated to the neck.  Plaintiff described the pain as dull and moderate in intensity.  He also

22  complained of stiffness.  Dr. Paez noted that this was an acute episode with no prior history of back

23  pain.  The pain began two weeks previously and Plaintiff did not recall any precipitating event or

24  injury.  He stated that the left hand tingling also began several weeks previously and was moderate in

25  intensity.  AR 246.  Dr. Paez's diagnoses were low back pain and carpal tunnel syndrome.  AR 247.

26  He prescribed medication and therapeutic injections for the low back pain and gave Plaintiff a

27  referral to an orthopedist for his possible carpal tunnel syndrome.  AR 248.

28      **(b) Consultive Medical Examination.**  Dr. Wenceslao A. Cabaluna performed a consultive

7

examination of Mr. Fisk on October 17, 2012 at the request of the Bureau of Disability Adjudication Services. AR 287-292. He also completed a residual functional capacity checklist on that date. AR 297-298. Plaintiff told Dr. Cabaluna that he had felt right side low back pain seven years earlier when he lifted a filing cabinet. The pain radiated into his right hip and the front of his right leg was numb. He was told by the ER that he had a pinched sciatic nerve in his right hip. The back pain was aggravated in a motor vehicle accident that occurred a year later. Plaintiff reported that "he now has pain across his lower back, right hip pain with numbness on the front of his right leg." AR 287. He had not taken any pain medication in over 6 months. *Id.*

Plaintiff felt right shoulder pain a year before his car accident that was not brought on by any trauma. The shoulder pain worsened after the car accident. He was diagnosed with a rotator cuff tear for which he underwent arthroscopic surgery. His shoulder "still pops and crackles." He could not hold his right arm up for an extended period of time and could not do anything above his head. AR 287. Plaintiff reported that his left middle finger was amputated and remained numb. Approximately six months prior to the examination, his left hand felt tingly. His doctor told him he had carpal tunnel syndrome, but gave him no treatment. This condition had not caused him any problem. *Id.* Plaintiff also reported feeling light headed and confused five years previously and that he was diagnosed with anxiety for which he was prescribed Clonazepam. If he did not take his medication, he would feel neck pain, light-headedness and confusion due to stress. He also reported a history of diabetes and hypertension. AR 287-288. Dr. Cabaluna also noted that Plaintiff had hernia surgeries in 2007 and 2009. Plaintiff had lost weight from 280 lbs to 235 lbs in the past two years. AR 288. However, he weighed 253 lbs on October 17, 2012. AR 289.

On examination of Plaintiff's extremities, Plaintiff's hand grasp was 5/5 on each side. There was no evidence of hand tremors, clubbing of fingers and toes, or other abnormal findings regarding the arms, hands, legs and feet. Plaintiff elevated his right shoulder to 130 degrees and abducted it to 100 degrees. He could pick up a coin from a flat surface and place it in a container without difficulty. He could also tie a knot, button and unbutton his shirt, and open a tightly closed jar without difficulty. AR 290. Dr. Cabaluna prepared a range of motion chart. AR 293-294. He noted that straight leg raising with Plaintiff in the supine position was negative at 45 degrees on both

8

1    sides, but Plaintiff felt pain in his right hip. Seated straight leg raising was negative on both sides

2    and there was no evidence of sciatica. AR 290. There was no evidence of musculoskeletal atrophy

3    or fasciculation  Gate and station were normal. Plaintiff was able to get on and off the examination

4    table, tandem walk, and walk on toes and heels without difficulty. He could squat and rise three

5    quarters. He did not need an assistance device. AR 291. Dr. Cabaluna stated that Plaintiff's

6    behavior during the examination was appropriate. He was able to relate to the doctor and to

7    understand and follow directions well. His memory and ability to concentrate were intact. *Id.*

8        In his residual functional capacity assessment, Dr. Cabaluna stated that Plaintiff could

9    occasionally lift 50 lbs and frequently lift 25 lbs. He could stand and/or walk about 6 hours in an 8

10   hour work day. He could sit 6 or more hours in an 8 hour work day. Plaintiff could frequently climb

11   ramps and stairs, stoop and bend, kneel, crouch and squat, and crawl. He could occasionally climb

12   ladders and scaffolds. AR 297. His ability to reach was limited by pain and decreased range of

13   motion in the right shoulder, but he was not limited in fingering, handling objects, hearing, seeing,

14   speaking or traveling. He had no environmental restrictions except for temperature extremes. Dr.

15   Cabaluna described Plaintiff's general appearance as dressed properly, alert and oriented. His

16   behavior was appropriate and cooperative. AR 298.

17       **(c) Dr. Mohammed Najmi.** Plaintiff was seen by Dr. Mohammed Najmi on November 20,

18   2012. AR 305-307. Dr. Najmi noted that Plaintiff's chief complaint was persistent back pain which

19   he stated was better. AR 305. Plaintiff's diabetes complaints were described as moderate. He also

20   reported right shoulder pain with a history of torn rotator cuff and joint effusion. The shoulder pain

21   was chronic and ongoing. Plaintiff's lower back pain was located at the midline and radiated into the

22   lower leg. Dr. Najmi noted questionable neuropathy. Plaintiff also complained of anxiety and

23   excessive worrying. *Id.* Plaintiff weighed 248 lbs. AR 306. Under physical examination findings,

24   Dr. Najmi stated that Plaintiff had good posture and his spine appeared benign. He further stated:

25   "ROM-hip: Left and right normal muscle strength/tone and left and right normal stability." *Id.* The

26   general neurological examination was unremarkable. Plaintiff also had normal mood and affect. *Id.*

27   Dr. Najmi listed the following diagnoses: mixed hyperlipidemia, obesity, backache, diabetes, benign

28   hypertension, and generalized anxiety disorder. *Id.* He recommended that Plaintiff follow-up in

1    three months. He also recommended exercise as tolerated and that Plaintiff follow a low cholesterol,

2    sodium and carbohydrate diet. He noted that Plaintiff deferred any orthopedic referral or MRI of the

3    back for the time being. AR 307.

4          Dr. Najmi next saw Plaintiff on February 4, 2013 at which time his chief complaint was an

5    upper respiratory infection. AR 302-304. Dr. Najmi saw Plaintiff in follow-up on February 12, 2013

6    by which time his respiratory infection was improved. AR 299-301. His chief complaint was severe

7    right shoulder pain and left hand and right thigh numbness. AR 299. Dr. Najmi again noted that

8    Plaintiff complained of myalgias. AR 300. He advised Plaintiff to return for a follow-up visit in 3

9    months. *Id.* Plaintiff subsequently saw Dr. Najmi on February 20, 2014. AR 314-316. This visit

10   appeared to be limited to evaluation and treatment of his hypertension and diabetes. *Id.*

11         **(d) Health Care Partners.** Plaintiff was seen at Health Care Partners on April 17, 2014 in

12   regard to his low back pain and radiating symptoms. AR 338-342, 346-347. According to the

13   musculoskeletal examination of Plaintiff's extremities, there was no cyanosis, clubbing or edema.

14   Range of motion was normal. There were no gross deformities. Plaintiff had an abnormal, slow

15   gait. There was normal curvature of the spine, full range of motion, no misallignment or tenderness,

16   normal stability, normal strength and tone. Under Neurologic, the report stated: "Cranial nerves 2

17   through 12 intact. Deep tendon reflexes 2+/4+ and symmetrical. No Babinski or clonus. Abnormal.

18   Weakness right lower extremity 4/5 however poor effort is suspected. Sensation normal to 10 gram

19   monofilament testing." AR 338.

20         X-rays of Plaintiff's lumbar spine were obtained on April 17, 2004. A lumbar spine MRI

21   was performed on April 25, 2014. AR 348-350. The x-ray showed degenerative changes within the

22   lumbar spine. There was no evidence of subluxation or spondylolisthesis. AR 348. The lumbar

23   MRI indicated the following: T12-L2 interspace was unremarkable; L1-L2 disc space was

24   unremarkable. There was a small hypertrophic osteophyte at the anterior margin of the disk; the L2-

25   L3 disk space was unremarkable; at L3-L4, no significant disk bulge or herniation was seen. There

26   was a very mild ligamentum flavum hypertrophy with facet joint effusion on the left. No significant

27   spinal stenosis was seen and the neural foramina were patent; At L4-L5, the space was mildly

28   narrowed. No significant disk bulge or herniation was seen. There was mild facet arthrosis and

small facet joint effusions left greater than right.  The neural foramina were patent; at L5-S1 the disk showed early signs of dessication.  There was minimal bulging of the disk indenting the epidural fat, but not touching the thecal sac or never roots.  Mild bilateral facet arthrosis was seen.  AR 349-350.

On April 25, 2014, Health Care Partners gave Plaintiff a referral to a pain management physician.  AR 343-344.  Plaintiff returned on June 5, 2014, reporting that the pain management physician "could not help him" and declined to establish a physician-patient relationship with him.  AR 329.  Plaintiff subsequently reported on August 4, 2014 that the pain management doctor stated that his insurance did not cover epidural injections.  AR 322.  He was given a referral to Dr. Joseph Reyes.  AR 321.

**(e) Dr. Joseph Reyes.**  Plaintiff saw Dr. Joseph Reyes on August 19, 2014.  AR 255-358.  He reported that his worst low back pain on a scale of 0 to 10 was a 10/10.  At its best, his pain was a 5/10.  With medications, his pain was a 2/10.  Plaintiff reported that his pain at the time of that visit was 7/10 and had been 5/10 during the preceding 24 hours.  Plaintiff stated that his current episode of pain had begun 10 years ago.  The pain was increased by walking, lifting, doing housework, and coughing or sneezing.  AR 355.  Dr. Reyes noted decreased range of motion in the right hip on flexion and extension.  Plaintiff also reported pain with back flexion and extension.  AR 356.  After reviewing the lumbar x-rays and MRI films, Dr. Reyes had a long discussion with Plaintiff regarding his history, examination and treatment options.  ARE 356-358.  Dr. Reyes stated that he would prescribe physical therapy first and would recommend hip imaging to determine if it was component to Plaintiff's pain.  AR 357.  He recommended that Plaintiff return in three to four weeks.  AR 358.  The record does not contain any subsequent notes by Dr. Reyes.

**6. Administrative Law Judge's July 8, 2011 Decision.**

The ALJ applied the five-step sequential evaluation process established by the Social Security Administration to determine whether Plaintiff was disabled.  The ALJ stated that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2015.  He also found that Plaintiff had not engaged in substantial gainful activity since January 1, 2011.  Although there was some indication that he assisted in the family home repair/maintenance business after that date, his income was minor.  AR 12.

1     At step two, the ALJ found that Plaintiff had the following severe impairments, and/or

2 combination of severe impairments pursuant to 20 CFR 404.1520(c):  back pain due to degenerative

3 disc disease, past history of shoulder surgery and pain, type II (adult onset) diabetes mellitus treated

4 with oral medication rather than insulin, "benign" hypertension generally controlled with medication,

5 and anxiety only mildly treated.  AR 12.  At step three, the ALJ found that Plaintiff did not have an

6 impairment or combination of impairments that met or medically equaled one of the listed

7 impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526.

8 AR 15-16.

9     Prior to step four, the ALJ found that Plaintiff had the residual functional capacity to perform

10 medium work as defined in 20 CFR 404.15467(c), except that Plaintiff could only occasionally

11 climb ladders, ropes and scaffolding.  In addition, Plaintiff was restricted to simple, repetitive and

12 routine tasks.  AR 16-19.  At step four, the ALJ found that Plaintiff would be unable to perform his

13 past work as a handyman or mechanic.  AR 19.  Although those jobs were at the medium exertional

14 level, they were skilled jobs which Plaintiff no longer had the ability to perform.  *Id.*  At step five,

15 the ALJ found that there were other jobs that exist in significant numbers in the national economy

16 that Plaintiff could perform.  AR 19-20.  The ALJ noted that if Plaintiff had the residual functional

17 capacity to perform the full range of medium work, a finding of not disabled would be directed by

18 Medical-Vocational Rule 203.22 and Rule 203.15.  Because Plaintiff's ability to perform medium

19 work was impeded by additional limitations, however, the ALJ relied on the vocational expert's

20 testimony that a person of Plaintiff's age, education, work experience, and residual functional

21 capacity could perform the medium, unskilled jobs of kitchen helper, for which 60,000 jobs were

22 available in the national economy, and sandwich maker, for which 50,000 jobs were available in the

23 national economy.[1]  The ALJ therefore concluded that Plaintiff was not disabled, as defined by the

24 Social Security Act, 20 CFR 404.1520(g), from January 1, 2011 through the date of his  decision.

25 AR 20.

---

27     [1] As previously stated, the hearing transcript states that the vocational expert's testimony regarding the number of kitchen helper jobs available in the national economy was inaudible.  AR 34.  Presumably, the ALJ

28 relied on his memory or notes regarding the vocational expert's testimony.  Plaintiff has not challenged the ALJ's decision on this point.

1

<u>DISCUSSION</u>

2

**I.     Standard of Review**

3       A federal court's review of an ALJ's decision is limited to determining only (1) whether the

4   ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper

5   legal standards. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924

6   F.2d 841, 846 (9th Cir. 1991).  The Ninth Circuit has defined substantial evidence as "more than a

7   mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might

8   accept as adequate to support a conclusion." *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000)

9   (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d

10   503 (9th Cir. 2001).  The Court must look to the record as a whole and consider both adverse and

11   supporting evidence. *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).  Where the factual findings

12   of the Commissioner of Social Security are supported by substantial evidence, the District Court

13   must accept them as conclusive.  42 U.S.C. § 405(g).  Hence, where the evidence may be open to

14   more than one rational interpretation, the Court is required to uphold the decision. *Moore v. Apfel*,

15   216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)).

16   *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  The court may not substitute its

17   judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the

18   ALJ's decision. *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

19       It is incumbent on the ALJ to make specific findings so that the court need not speculate as to

20   the findings. *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981), citing *Baerga v. Richardson*,

21   500 F.2d 309 (3rd Cir. 1974).  In order to enable the court to properly determine whether the

22   Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as

23   comprehensive and analytical as feasible and, where appropriate, should include a statement of

24   subordinate factual foundations on which the ultimate factual conclusions are based." *Lewin*, 654

25   F.2d at 635.  In reviewing the administrative decision, the District Court has the power to enter "a

26   judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

27   with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In the alternative, the

28   District Court "may at any time order additional evidence to be taken before the Commissioner of

13

1  Social Security, but only upon a showing that there is new evidence which is material and that there

2  is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

3  ## II.   Disability Evaluation Process

4  To qualify for disability benefits under the Social Security Act, a claimant must show that (a)

5  he suffers from a medically determinable physical or mental impairment that can be expected to

6  result in death or that has lasted or can be expected to last for a continuous period of not less that

7  twelve months; and (b) the impairment renders the claimant incapable of performing the work that

8  the he previously performed and incapable of performing any other substantial gainful employment

9  that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also*

10  42 U.S.C. § 423(d)(2)(A).  The claimant has the initial burden of proving disability.  *Roberts v.*

11  *Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996).  If the claimant

12  establishes an inability to perform his prior work, the burden shifts to the Commissioner to show that

13  the claimant can perform a significant number of other jobs that exist in the national economy.

14  *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007).

15  Social Security disability claims are evaluated under a five-step sequential evaluation

16  procedure.  *See* 20 C.F.R. § 404.1520(a)-(f).  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir.

17  2001).  The five steps are accurately set forth in the ALJ's decision, AR 10-12, and will not be

18  repeated here.

19  ## III.   Whether the ALJ Erred In Rejecting the Credibility of Plaintiff's Testimony Regarding the Severity of his Impairments.

20

21  None of Plaintiff's treating physicians opined that Plaintiff was disabled.  Nor did they

22  provide a residual functional capacity (RFC) assessment that was more restrictive than the one

23  provided by the consulting, examining physician, Dr. Cabaluna, which was substantially adopted by

24  the ALJ.  In this regard, the ALJ stated that "[t]he claimant has not submitted a more restrictive

25  physical or mental health assessment form or report from any of his treating, examining, or

26  evaluating physicians or clinicians."  AR 17.  Plaintiff's claim that he is disabled, therefore

27  substantially depends on the credibility of his statements and testimony that his pain and other

28  symptoms were of such severity as to render him disabled.

14

1    Plaintiff argues that the ALJ's decision should be reversed because he failed to provide

2    specific, clear and convincing reasons for rejecting the credibility of Plaintiff's testimony regarding

3    the severity of his pain or other symptoms.  *Motion for Reversal* (ECF No. 17), pgs. 4-14.  Plaintiff

4    further argues that this case should be remanded with directions to pay benefits pursuant to the

5    "credit-as-true" rule.  *Id.* at 14-15.  The Commissioner argues that the ALJ provided sufficient

6    reasons to reject the credibility of Plaintiff's testimony.  She also argues that the evidence supports a

7    finding that Plaintiff was malingering, which eliminates the requirement to provide clear and

8    convincing reasons for rejecting Plaintiff's testimony.  *Cross-Motion to Affirm* (ECF No. 18), pg. 6.

9    Ninth Circuit case law holds that if the claimant has presented sufficient evidence of an

10   underlying physical or mental impairment that could reasonably cause his symptoms, then, in the

11   absence of evidence of malingering, the ALJ must provide specific, clear and convincing reasons for

12   rejecting the credibility of the claimant's testimony regarding the severity of his pain or other

13   symptoms.  *Burrell v. Colvin*, 775 F.3d 1133, 1136–37 (9th Cir. 2014) (citing *Molina v. Astrue*, 674

14   F.3d 1104, 1112 (9th Cir. 1991) (en banc); *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989);

15   *Gallant v. Heckler*, 753 F.2d 1450, 1455 (9th Cir. 1984)).[2]  The ALJ must state the reasons why the

16   testimony is unpersuasive, and must specifically identify what testimony is credible and what

17   testimony undermines the claimant's complaints.  *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d

18   685, 693 (2009) (quoting *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir.

19   1999)).

20   The ALJ may not reject a claimant's subjective complaints based solely on a lack of medical

21   evidence to fully corroborate the alleged severity of pain.  The rationale for this restriction is that

22   pain testimony may establish greater limitations than can medical evidence alone.  *Burch v.*

23   *Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (citing SSR 96–7p (1996)).  In determining credibility,

24   the ALJ may engage in ordinary techniques of credibility evaluation, such as considering claimant's

25   reputation for truthfulness and inconsistencies in claimant's testimony.  *Id.* (citing *Tonapetyan v.*

26   *Halter,* 242 F.3d 1144, 1148 (9th Cir. 2001)).  The ALJ may also consider factors such as (1) the

27

28   _____

     [2] Although the Commissioner disputes the correctness of this standard, she recognizes that the Court is
     bound by it.  *Cross-Motion to Affirm* (ECF No. 18), pg. 6.

1   nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and

2   aggravating factors (e.g., movement, activity, environmental conditions); (3) type, dosage,

3   effectiveness, and adverse side-effects of any pain medication; (4) treatment, other than medication,

4   for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities. *Id.* (quoting

5   *Bunnell*, 947 F.2d at 346)). As these factors indicate, the medical records may, in fact, provide

6   relevant information that impeaches the credibility of Plaintiff's testimony. For example, medical

7   records indicating that a claimant denied pain or reported only mild pain in a particular body part,

8   may properly be used to discount his later claims of severe pain in that body part.

9       In this case, the ALJ followed the two-step process by first determining that Plaintiff's

10  medically determinable impairments could reasonably be expected to cause his alleged symptoms.

11  The ALJ found, however, that Plaintiff's statements concerning the intensity, persistence and

12  limiting effects of his symptoms were not entirely credible. AR 19. The ALJ's reasons for rejecting

13  the credibility of Plaintiff's statements and testimony are spread throughout his detailed, but often

14  rambling decision. The ALJ's decision was based primarily on his evaluation of the medical records

15  which he concluded did not support Plaintiff's complaints of severe pain and other symptoms. In

16  some instances, the ALJ misstated the record. The Court must determine whether, notwithstanding

17  those misstatements, the ALJ provided specific, clear and convincing reasons for rejecting Plaintiff's

18  statements and testimony.

19      In evaluating whether Plaintiff had severe impairments at step two of the sequential process,

20  the ALJ noted that Plaintiff did not appear to have significant pain or other symptoms when he

21  stopped working in January 2011. AR 13. The medical records at or about that time primarily

22  addressed Plaintiff's diabetes and hypertension and did not indicate that he was experiencing

23  significant symptoms from those diseases or conditions. *Id.* Although shoulder pain was mentioned

24  in the current problems list in Dr. Paez's March 22, 2011 office visit note, "there were no actual

25  musculoskeletal findings on examination, and the claimant was not taking any pain medication at

26  this time." *Id; see* AR 264. The medical findings were the same six months later in June 2011. *Id.*

27  The assessment of "chronic shoulder pain" was not made until September 27, 2011. *Id.*

28      The ALJ's statements regarding Plaintiff's right shoulder pain are only partly accurate. Dr.

16

1   Paez's notes show that on December 9, 2010, less than a month before he stopped working, Plaintiff

2   complained of localized pain in the shoulder joint which he described as moderate in severity. AR

3   267. Although Dr. Paez did not note shoulder symptoms on March 22, 2011, he noted that Plaintiff

4   again complained of right shoulder pain on June 23, 2011, which was described in the same terms as

5   in his December 9, 2010 note. He also noted under range of motion that Plaintiff had right shoulder

6   pain with abduction and tenderness to pressure in the right shoulder. AR 261. There appeared to be

7   no change in the severity of the shoulder pain from what was reported in December, 2010. It also

8   appears from Plaintiff's subsequent statements that he had a long history of right shoulder pain and

9   had been able to work despite that pain.

10      The ALJ correctly noted that the first reference to "back pain that was reportedly causing a

11  tingling sensation and radiating to the left hand" was on May 21, 2012 (more than a year after

12  Plaintiff stopped working). Plaintiff s told the doctor that these symptoms started only "'several

13  weeks ago.'" AR 13-14. Dr. Paez's office visit note stated: "This is an acute episode with no prior

14  history of back pain. He states the current episode of pain started 2 weeks ago." AR 246. Plaintiff

15  also reported that his left hand tingling "began several weeks ago" and was of moderate intensity. *Id.*

16  The ALJ, however, incorrectly stated that a positive Tinel's sign was found during this examination.

17  AR 14. Instead, there was a positive Phalen's test, AR 247, which, like a positive Tinel's sign, is an

18  indicator of carpel tunnel syndrome.[3] The ALJ correctly noted that during Dr. Cabaluna's

19  subsequent examination on October 27, 2012, the "Phalen's and Tinel's signs were now both

20  negative, bilaterally," thus detracting from a diagnosis of carpal tunnel syndrome. AR 14. *See also*

21  AR 290. The ALJ also cited Dr. Cabaluna's findings that Plaintiff demonstrated normal extremities

22  without sensory or motor strength loss and that there was no evidence of sciatica and Plaintiff

23  walked with a normal gait. AR 14. The ALJ also noted that Plaintiff reported to Dr. Najmi on

24  November 20, 2012 that his back pain "'is better.'" AR 14. The first sentence of the note states: "c/o

25  persistent back pain– but is better." AR 305.

26      The ALJ noted that on February 4, 2013 the musculoskeletal examination was

27

28      [3] *See* PubMed.gov, US National Library of Medicine, National Health Institute, Abstract Nov. 15, 1992, at www.ncbi.nlm.nih.gov/pubmed/1461811.

17

1    "unremarkable" and Plaintiff denied gait difficulty, leg pain, hip pain, shoulder pain and neck pain

2    on that date. AR 14. The medical record indicates, however, that this visit related to Plaintiff's upper

3    respiratory infection. AR 302-304. During the following visit eight days later on February 12, 2013,

4    Plaintiff complained of severe right shoulder pain, and left hand and right thigh numbness. AR 299.

5    There was no specific mention of low back pain, however. The ALJ also noted that a year later on

6    February 20, 2014, Dr. Najmi did not note any complaints of shoulder, back or leg pain or other

7    symptoms. AR 14; *see* AR 314-316.

8        The ALJ noted that on April 17, 2014, Plaintiff was diagnosed with lumbar radiculopathy,

9    "as he demonstrated slightly decreased motor strength of 4/5 in one lower extremity, although 'poor

10   effort' was suspected as cause since sensation was otherwise full and normal." AR 14. The April

11   25, 2014 lumbar MRI report showed "'minimal' degenerative changes, mainly bulging with 'mild'

12   facet arthrosis and mild ligament hypertrophy." The report showed no evidence of compression

13   deformities, subluxation, or spondylolisthesis, although Plaintiff still alleged difficulty walking. AR

14   15. The ALJ stated that "[t]he record ends on August 19, 2014, as the claimant complained of back

15   and leg pain which were currently at about a level of 2-5 on a 1-to-10 pain scale, but worse with

16   walking, lifting, household chores, coughing, or sneezing." AR 15. The ALJ, again, partly misstated

17   the record. According to the Dr. Reyes, Plaintiff reported his current pain level was 7/10 and had

18   been 5/10 during the preceding 24 hours. AR 355.

19       In concluding at step three of the process that Plaintiff's low back and leg numbness did not

20   meet or medically equal a listed impairment, the ALJ stated that Plaintiff maintained normal lower

21   extremity sensation, with negative straight leg raising signs, "and almost invariably demonstrated a

22   normal gait and station even as he allegedly had difficulty walking. He does not use an assistive

23   device such as a cane, but continues to drive." AR 15. In finding that Plaintiff's alleged mental

24   impairment of anxiety did not meet or equal a listing, the ALJ noted that he had only mild restriction

25   in activities of daily living. Plaintiff could self-groom without problems and prepare simple meals.

26   He drove an automobile and shopped at a grocery store. AR 16.

27       The ALJ also stated that "[t]he claimant still goes fishing, if not often." AR 16. This latter

28   comment misrepresents the nature of Plaintiff's statements and testimony. Plaintiff stated in his

18

1    August 8, 2012 function report that he could not go fishing often because he could not stand or be

2    out in the sun very long.  AR 174.  Plaintiff testified at the hearing that he had tried to go fishing

3    during an out-of-town trip, but was unable to, and could not drive home because of the pain in his

4    back and hip.  AR 39.  These statements hardly indicate that Plaintiff had a continuing ability

5    engaging in fishing which contradicted his claims of severe pain.

6        In his evaluation of Plaintiff's credibility, the ALJ again summarized the medical evidence

7    that supported the conclusion that "there is no continuous 12 month period according to the record in

8    which the claimant would have been unable to perform at least simple medium work—certainly no

9    physician or clinician in the record says he can't."  AR 17.  Although Plaintiff testified that he tried

10   to work, but was unable to do so, the ALJ stated that "he has supplied no documentary support of

11   this allegation such as statements by his employer or related hospitalization records."  AR 17.

12       The ALJ also stated that Plaintiff's financial complaints did not support a finding that he was

13   disabled within the meaning of the Social Security Act.  AR 18.  The implication that Plaintiff made

14   such an assertion is also a mischaracterization of his testimony.  The ALJ initially asked Plaintiff

15   what he had been doing for money since January 2011.  Plaintiff responded that he had been selling

16   everything he owned in order to pay his bills.  The ALJ then asked Plaintiff what prevented him

17   from working.  Plaintiff responded by listing his physical impairments, including his shoulder, his

18   left hand numbness, his right hip and leg, and the medication which causes dizziness.  AR 36.

19   Plaintiff did not assert that his financial problems were evidence of his disability.

20       The ALJ finally noted inconsistencies in Plaintiffs statements regarding his limitations:

21       The claimant testified that he could not walk for 3 days after going to
         physical therapy.  However, the record does not document any
22       significant efforts with physical therapy, certainly not of a durational
         nature.  The claimant alleged that he could only sit for 30 minutes and
23       stand for 30 minutes, (EX. 12E) although during the hearing testified
         to one hour sitting tolerance, and with the general disposition to lie on
24       the couch for six hours a day.  If the claimant shops for one hour, it is
         likely he can stand for longer than 30 minutes.  The undersigned finds
25       no longitudinal medical foundation for such subjective limitations.  In
         Ex. 12E, the claimant alleges that his wife does all the household
26       chores, but this might simply be gender preference.

27   AR 18.

28   Although some of the ALJ's findings were incorrect or misrepresented Plaintiff's statements

1    and testimony, the ALJ did not base his findings on the mere recitation of boilerplate language as

2    Plaintiff argues.  *Motion* (ECF No. 17), pg. 7-8,   The ALJ evaluated the medical records in

3    significant detail.  He found lacking therein evidence to support Plaintiff's complaints of severe pain

4    and other symptoms.  The ALJ was clearly correct in noting the absence of complaints of severe

5    shoulder pain, back pain, or numbness and tingling at or about the time Plaintiff's stopped working.

6    He ignored or underestimated Plaintiff's complaints of moderate shoulder pain shortly before and

7    during the first several months after he stopped working.  Complaints of low back pain and left arm

8    tingling, did not appear until March 2012, more than a year after Plaintiff stopped working.  The

9    absence of such complaints casts substantial doubt on Plaintiff's testimony that he stopped working

10   in January 2011 because of disabling symptoms.

11        Plaintiff also asserts that the ALJ found that his "inability to afford treatment is an 'excuse'

12   that hurts his credibility."  *Motion* (ECF No. 17), pg. 10.  The ALJ stated: "The claimant similarly

13   explained in his hearing testimony that there had been so little medical treatment lately because of a

14   lack of medical insurance.  Indeed, this was the same excuse in the record for why the claimant never

15   followed up on a pain medicine specialist referral."  AR 18.  Plaintiff argues that this finding was

16   clearly improper because the Ninth Circuit has proscribed the rejection of a claimant's complaints for

17   lack of treatment when the record establishes that the claimant could not afford it.  *Id.* (citing

18   *Regennitter v. Comm'r S.S.A.*, 166 F.3d 1294, 1297 (9th Cir. 1999); *Smolen v. Chater*, 80 F.3d 1273,

19   1284 (9th Cir. 1996)).

20        The ALJ's statement, like others, was partly inaccurate.  The record does not show that

21   Plaintiff "never followed up on a pain specialist referral."  It shows, instead, that Health Care

22   Partners gave Plaintiff a referral to a pain management specialist in April 2014.  Plaintiff returned in

23   June, 2014, stating that the pain management physician said he "could not help him" and had

24   declined to establish a physician-patient relationship with him.  Plaintiff told Health Care Partners

25   that the pain management doctor said his insurance would not cover epidural injections.  (There was

26   apparently no statement in the pain management doctor's note, itself, that he could not provide

27   epidural injections because of a lack of insurance coverage.)   Plaintiff was then given a referral to

28   Dr. Reyes who saw him on August 19, 2014.  AR 322, 358.

1    Dr. Reyes did not recommend epidural injections.[4]  He prescribed physical therapy and stated

2    that he would obtain an image of the right hip to see if it was a component in Plaintiff's pain.  AR

3    358.  This visit occurred a little more than one month before the September 22, 2014 hearing.

4    Plaintiff testified at the hearing that he had attended one physical therapy session and that he had

5    another session scheduled that day.  AR 38.  He also testified that he had health insurance since

6    January 2014.  AR 41.  No records were submitted after the hearing to show whether Plaintiff

7    continued to receive physical therapy or returned to Dr. Reyes for further evaluation or treatment.  In

8    short, there is no reliable evidence that Plaintiff was unable to pursue recommended treatment

9    because of the lack of insurance or financial resources.   There is also no evidence that Plaintiff

10    pursued physical therapy recommended by Dr. Reyes, and, if he did, what the results of that

11    treatment were.  The ALJ was incorrect, however, in stating that Plaintiff never followed up on a

12    pain management specialist referral.

13    Plaintiff argues that the ALJ improperly criticized Plaintiff's attempts to work in order not to

14    be destitute.  *Motion* (ECF No. 17), pg. 11.  The ALJ, however, did not criticize Plaintiff's work

15    efforts or suggest that his attempts to work contradicted his claim of disability.  The ALJ merely

16    noted that there was uncertainty as to the work performed by Plaintiff after the alleged disability

17    onset date.  He found, however, that Plaintiff's earnings after January 1, 2011 were so modest as to

18    not rise to the level of substantial gainful employment.  AR 12.  Plaintiff's attack on the ALJ's

19    decision on this ground is without merit.

20    Plaintiff is correct that the ALJ did not find that he is a malingerer.  *Motion* (ECF No. 17),

21    pg. 12.  The Commissioner's argues that one reference in the medical record, to a suspicion that

22    Plaintiff was not giving full effort, is sufficient to support a finding of malingering.  This assertion is

23    also without merit.  The Commissioner's reliance on *Osenbrock v. Apfel*, 240 F.3d 1157, 1166 (9th

24    Cir. 2001) is misplaced.  The ALJ in that case stated that two medical providers questioned the

25    reliability of the claimant's statements regarding his symptoms.  The ALJ, however, did not find that

26    the claimant as a malingerer.  Rather, he relied on these statements, together with other evidence, to

27

28

----

[4] This raises further doubt as to whether the first doctor recommended injections.

21

1    reject the credibility of the claimant's testimony.  The court agreed that this evidence supported the

2    ALJ's decision.  *Id.* at 1165.   In this case, the ALJ properly considered the Health Care Partners

3    treatment note in evaluating the credibility of Plaintiff's statements and testimony.  That one note,

4    alone, does not support a finding of malingering and a rejection of Plaintiff's testimony.

5                                             **CONCLUSION**

6            The conclusion that a claimant's statements and testimony "is not entirely credible" must be

7    based on an accurate recitation of the record in order for the ALJ's decision to be valid.  An ALJ's

8    decision may still be upheld, however, if, setting aside his misstatements and misrepresentations of

9    the record, there remains substantial evidence, and specific, clear and convincing reasons given by

10   the ALJ, to justify his rejection of the Plaintiff testimony.

11           In this case, the medical records contain no statement or opinion by any of the treating,

12   examining or consulting physicians that Plaintiff was experiencing severe pain or limitations of a

13   disabling nature. None of the physicians provided an assessment of Plaintiff's residual functional

14   capacity which indicated that he was incapable of performing medium level work, or work at a lower

15   exertional level such as light or sedentary work.  Plaintiff's testimony regarding the severity of his

16   pain and symptoms is not supported, overall, by his reports of pain to examining or treating medical

17   providers.  The treatment that was prescribed to Plaintiff, while consistent with him experiencing

18   some level of pain, is not consistent with a patient experiencing severe symptoms.  Although

19   Plaintiff stated that his ability to sit, stand and walk was severely limited, the physical examination

20   findings of the examining physician were inconsistent with such limitations.  Furthermore, the

21   records of Plaintiff's treating physicians also failed to document or support such limitations.

22   Accordingly,

23                                          **RECOMMENDATION**

24           **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Remand (ECF No. 17) be

25   **denied**, and that the Acting Commissioner's Cross-Motion to Affirm (ECF No. 18) be **granted**.

26                                              **NOTICE**

27           Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in

28   writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held

that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 22nd day of March, 2017.

GEORGE FOLEY, JR.
United States Magistrate Judge